IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA


ZACHARY BOLLING,

          Plaintiff,

v.                                        Civil Action No. _____ 2:23-cv-00185
                                        Honorable _____

SERVICE ELECTRIC COMPANY,
a Tennessee corporation;
QUANTA SERVICES, INC.,
a Texas corporation,
JOHN DOE COMPANY 1-3,

          Defendants.


## **<u>COMPLAINT</u>**

Plaintiff complains and says as follows:

1.      Plaintiff Zachary Bolling (hereinafter sometimes referred to as "Zac") was and is a resident of Jumping Branch, West Virginia.

2.      Defendant Service Electric Company (hereinafter "Service Electric"), is a Tennessee Corporation, authorized to do business and does business in West Virginia, which, at all times complained of herein, maintained a local business location in Dunbar, Kanawha County, West Virginia.

3.      Service Electric did and does business in West Virginia including the Southern District, offering and performing electrical contracting services.

4.      Defendant Quanta Services, Inc. (hereinafter "Quanta Services"), is a Texas Corporation, which, at the time of the plaintiff's injury, was authorized to do business in West Virginia and does business in West Virginia.

5.      Before and at the time of the plaintiff's injury and after, Quanta Services did and does business in West Virginia including the Southern District, offering and performing electrical contracting services.

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. 1332 in that the citizenship of the plaintiff is diverse from the citizenship of the defendants and the amount in controversy exceeds the jurisdictional limit of $75,000.00.

7.      Plaintiffs do not know the true names of defendants John Doe Company 1, 2, and 3, inclusive, and therefore sue them by those fictitious names. Plaintiffs are informed and believe, and on the basis of that information and belief allege, that each of those defendants was in some manner legally and proximately responsible for the events and happenings alleged in this complaint and are companies that do business in West Virginia including the Southern District, offering and performing electrical or power service work.

8.      Plaintiff Zachary Bolling was an employee of Service Electric and/or Quanta Services at the time of his injury. He was hired in West Virginia. He worked out of the Service Electric Dunbar location.  He resided in West Virginia at the time of his hire by Service Electric and at the time of his injury on March 10, 2021.

9.      Zachary Bolling was regularly employed in the state of West Virginia and performed work in West Virginia prior to his injury.

2

10.    At the time of his injury that is the subject of this Complaint, Zachary Bolling was temporarily working at the border of West Virginia and Virginia.

11.    Plaintiff filed for benefits under the West Virginia's Workers' Compensation Act for the injury that is the subject of this Complaint and, after administrative litigation, received approval of his claim and received benefits under West Virginia's Workers' Compensation laws.

12.    Service Electric and/or Quanta Services and/or John Doe Company 1, 2, and 3, regularly employed persons, including Zachary Bolling, for the purpose of carrying on a form of industry, service or business in West Virginia.

13.    Plaintiff's cause of action can be filed and maintained in West Virginia as part of the workers' compensation benefits afforded an employee under W. Va. Code 23–2–1a *et seq.*

14.    Prior to March 10, 2021, defendants and/or its or their parent or subsidiary, entered into an agreement with and arrangement with American Electric Power to perform certain work repairing a transmission tower that was damaged.

15.    At times complained of herein, defendants undertook certain duties and responsibilities, including performing disassembly of a transmission tower and work on transmission power lines. Zachary Bolling was assigned to assist in these duties.

16.    Specifically, twenty-five-year-old Zachary Bolling was working as a groundsman for defendants, who were working as a contractor of American Electric Power ["AEP"]. Their crew was assigned to dismantle a large transmission tower that

had been damaged in a previous storm. The tower was up on a mountain with rocky terrain and it was windy that day.

17.    At the time of his injury, Zac and the rest of the crew, which included his immediate foreman, Freddie Ray Boggs and the General Foreman, Philip Hanshaw, were in the process of lowering a transmission power line down from the tower in order to eventually disconnect the line from the tower.

18.    The transmission line they were working on that day was an express line, which meant that the line went directly from an area in Roanoke, Virginia to West Virginia, without any breaks down to a substation, and it carried 345,000 volts. To the foreman's knowledge, the area where they were working was the only spot it was grounded on the 400-mile line.

19.    A lineman on the crew, Shawn Fisher, who was working up in the air in a bucket truck at the damaged tower, measured the voltage at zero and grounded the transmission line to the transmission tower by connecting a grounding line from the transmission line (also called a "conductor," or "phase") to the tower. The lineman began to lower it toward the ground level. However, the grounding line he used, which was connected to the transmission line and the tower, was not long enough to reach all the way to the dirt level. Therefore, the crew needed to grab the wire and connect it to another grounding line that ran to a rod that was in the dirt, which they did, and then the tower ground was removed.

20.    The line the plaintiff was working on was not sufficiently grounded.

21.     One of the problems was that the rod was placed in rocky terrain and, according to AEP investigators, was only 10 inches in the ground. The foreman testified in plaintiff's Workers' Compensation claim that it was really rocky and hard to get anything in the ground.  The foreman also testified that you need to put a grounding rod two to three feet into the dirt. Rocky terrain and a rod not deep enough in the soil make for an unsafe, poor power ground.

22.     Others on the crew along with the general foreman Hanshaw were grabbing the transmission line to continue to lower it down. According to foreman Boggs, Zac, who was closest to the rod, grabbed the transmission line as well, but Zac also had ahold of a rigging cable which had a large grip attached to it, which attached to a steel choker on a nearby dozer.  Zac was the only one who had the rigging cable and the transmission line. The others only had ahold of the transmission line.

23.     According to witnesses including the foreman, one of the crew told Zac to let go of the line, but he could not, and he tensed up and then collapsed to the ground. He was not breathing. Co-workers began CPR. Zac started to turn blue.

24.     Foreman Boggs ran to the truck to get the AED--automated external defibrillator, which is kept on these worksites because electric power line workers are at risk for shocks causing cardiac arrest. The defibrillator is placed on the person and it tells the operator whether the person needs a heart shock or not. In this case, the AED instructed the operator that Zac needed a shock, and the AED administered the shock. Eventually, Zac began to take very shallow breaths and gasps of air.  He continued to

do so while he was being transported from the mountain worksite to an ambulance and then a Life Flight helicopter. Zac remained unconscious.

25. Zac's wife Jessica Bolling was called by the employer and told that they did not believe Zac was shocked because the line was (supposedly) grounded and others were working on it. Zac was at the hospital, still unconscious.

26. However, that same day, the foreman was shocked on the same line and the line was measured showing 600 volts of electricity.

27. Specifically, after Zac was transported to the hospital, the foreman and the crew gathered to give statements to the employer. After giving statements, Foreman Boggs went back up to the site to secure the transmission line the plaintiff was working on. When the foreman grabbed the line, which was still attached to the ground rod, he too was shocked. Thankfully, the foreman was not shocked as severely as Zac. Boggs told everyone there he was shocked.

28. Foreman Boggs and lineman Shawn Fisher then tested the transmission line that shocked the plaintiff and him. The tester showed that the line had 600 volts of power on it, even though it was still connected to the same rod in the ground.

29. Foreman Boggs then told the AEP representative there, Josh Fisher, that they needed to call the hospital to let them know that Zac may have been shocked, and Boggs assumed that the employer/defendants' safety man, Tony Booth called the hospital because he overheard him talking to someone about it, although he did not know who.

30.     Six-hundred volts is a lot of electricity and is more than enough to stop a person's heart or kill them. For perspective, electricity from the transformer on the power pole leading to your home is only 120 to 240 volts.

31.     The plaintiff was shocked because of induced voltage with an insufficient ground.

32.     AEP and its safety contractor, Safety Management Group, performed an investigation of the incident. In the investigation report, AEP acknowledged that:

• Later in the day (approximately three hours after the event) it was discovered that there was a measurable amount of induced voltage (500v-600v) on the grounded conductor where the crew had been working.

• It was determined that voltage was present due to a high impedance ground source.

• The ground was moved to the base of the structure, which was determined to be a lower impedance path to ground, and the crew was able to get a 0v [zero volt] reading on the conductor at that time and prior to the start of work the following day.

33.     Upper management of the employer was also present at the scene.

34.     Induced voltage is electricity that can occur on a de-energized power line, due to electromagnetic fields from surrounding lines or even from power a long way down a line. A high impedance ground source is a ground that does not create a good connection to the earth to dissipate the electricity, in this case the rod that was in rocky terrain and only 10 inches in the ground. There is more of a danger of injury from induced electricity when there are larger voltage lines, when it is windy, and when the

line is not well grounded, all of which were present at the time the plaintiff was shocked.

35.    While the defendant employer suggested to AEP that an underlying medical condition may have caused plaintiff to collapse on the job site, even AEP reluctantly conceded that, "The crew member could have been negatively affected by the presence of induced voltage on the conductor."

36.    Neither the plaintiff nor his wife were told by the defendants about the foreman getting shocked and that there were 600 volts measured on that power line.

37.    In the meantime, plaintiff's wife, Jessica Bolling was at the hospital, scared about what happened to her husband. Remember that, when she learned of Zac's injury on March 10, 2021, she was told that it was not a shock because there were two others holding the power line at the same time. Zac was on a ventilator and unresponsive. For that reason, she tried to think of anything and everything that she could that might help the hospital find out what happened to him.

38.    Once Zac regained consciousness, Zac did at first tell the doctors that he was shocked and felt it go into his left finger and that he had his left elbow on the line. The doctor found marks on his left index finger, on his left elbow and between his toes on his left foot, and assumed he had been shocked at work, at first.

39.    However, Zac, who had just suffered a prolonged respiratory and cardiac arrest, was confused about the details and who he was working with, so Zac and his wife came to believe the defendants/employer that he was not shocked. His wife even

texted to defendants/employer what Zac said to the doctors about getting shocked to the employer on  March 11, 2021, the day after his collapse.

40.    Incredibly, Jessica Bolling and Zac were not told by the defendants/employer what defendants knew within hours of Zac's collapse – that there was voltage found on that line Zac was holding and that his foreman Boggs also got shocked when he grabbed that line. Had Jessica Bolling been told that promptly, she would have made sure the hospital and doctors knew it. The hospital was operating on the assumption that he might have had a medication reaction or a seizure or his heart failed for no reason.

41.    In the days that followed, Jessica Bolling texted Zac's employer/defendants about what was going on with Zac in the hospital. On March 13, 2021, three days after his injury, she explained that they were waiting for a heart MRI and Zac may have to stay until the following week to get the results because they couldn't figure out what would make a healthy 25-year old's heart stop.  She told the employer/defendants that the doctors were going to put an implant in Zac, since they did not know the cause and in case it would happen again. Again, nothing was mentioned by the employer/defendants about what happened with Foreman Freddie Boggs or the voltage on the line.

42.    Again on March 15, 2021, Jessica Bolling texted the employer/defendants, saying that the doctors had run all tests they could think of and still couldn't figure out why a 25-year-old would just die. Jessica Bolling texted the employer/defendants

specifically, that the doctors keep asking if he's sure he didn't get shocked, and that was the only thing that made sense.

43.    Jessica Bolling texted the employer that she was having a hard time keeping it together and did not want to take Zac home without knowing what is wrong and him die.  Again, there was no mention from the employer/defendants about what happened with Boggs or the voltage found on the line. This is reprehensible and deliberately intentional behavior on the part of the employer/defendants.

44.    Zac and his wife did not find out about what happened with Freddie Boggs and there being voltage on the line until Zac went back to work on trial light duty in April, when co-worker Jason Bryant told him.

45.    The defendants'/employers' failure to tell Jessica Bolling and Zac about what happened with Freddie Boggs getting shocked and there being voltage on the line left them and the hospital and doctors in the dark, and Zac left the hospital with no determination of what caused his heart to stop. Zac had to have a cardiac loop implant surgery to record his heart since they did not know for certain what the cause was.

46.    Once the cardiologist learned what really happened, he determined that Zac suffered an electric shock at work.

47.    The deliberate intentional conduct of the defendants interfered with the claimant receiving an accurate diagnosis and initially led to the denial of his Workers' Compensation claim. The claim file obtained from the Workers' Compensation claims administrator for defendants has the texts Jessica Bolling sent to the employer, but there

was zero documentation produced from the file about the fact that the foreman was shocked the same day on that line and the fact that there were 600 volts measured on it.

48.     The defendants/employer attempted to benefit from a situation they improperly and fraudulently created by withholding critical information from the plaintiff about the circumstances surrounding his injury, illustrating the defendants' state of mind.

49.     After many extensions of time deadlines for well over a year, the West Virginia Workers' Compensation Board of Review (which replaced the previous Workers' Compensation Office of Judges) ruled the claim compensable.

50.     The plaintiff has not been referred for a permanent impairment percentage because the employer/defendants have appealed the Board of Review order to Intermediate Court of Appeals. This results in a stay of proceedings for determination of permanent impairment.

51.     However, the plaintiff has permanent impairment caused by his work injury of 13% percent or more sufficient to meet the threshold under W.Va. Code § 23-4-2 as determined by medical evaluation.

52.     At all times complained of herein, Defendants Service Electric and Quanta Services and John Doe Company 1, 2, and 3 were acting for and on their own behalves and on behalf of each other, as agents of one another, in the provision of electrical service work, including the work that was being performed at the site of Zachary Bolling's injury.

53.     All of the defendants were acting through their agents, servants and employees, who were all acting in the course and scope of their agency and/or employment.

54.     Prior to and on March 10, 2021, defendants had statutory duties under safety laws, rules and regulations by which defendants were required to provide a safe place to work with and around electrical transmission lines and specifically to ensure that transmission power lines were properly grounded and tested prior to requiring the plaintiff and others to work on the line, which work was directed by defendants.

55.     Prior to and on March 10, 2021, defendants had the duty and responsibility to provide their employees who were working at the job site with a safe place to perform work on or around transmission power lines, and specifically, to provide them with proper equipment, supplies, and materials; to ensure that proper safety practices were being followed; to ensure that proper protective equipment and devices, including grounds, were being used in the correct manner and to provide a safe environment in order for the employees to be able to perform work at the job site in a safe manner.

56.     Zachary Bolling relied upon defendants to supervise, direct, and control his work, provide him with a safe environment in which to work, provide him with safe equipment, material, supplies and environment, to ensure that proper safety practices were being followed, to ensure that proper protective equipment and devices, including grounds, were being used in the correct manner, to provide proper task training and

other training, and to otherwise provide a safe environment to perform work they requested of him.

57.    Defendants had a non-delegable duty for the safety of the persons performing work on their job site, due to the ultra-hazardous nature of the high power transmission lines and condition of the transmission tower and ultra-hazardous work being performed.

58.    Defendants required and directed work to be performed at the job site in conditions which created specific unsafe working conditions that were unreasonably dangerous and with equipment, material, tools, supplies and conditions, including grounds, which were dangerous.

59.    As verified in attachment 1 hereto by a person with knowledge and expertise of the workplace safety statutes, rules, regulations and consensus industry safety standards specifically applicable to the industry and workplace involved in the plaintiff's injury, prior to and on March 10, 2021, defendants violated statutory and written safety rules and regulations, and industry standards, including, but not limited to, the following:

a.    29 CFR 1910.269(m)(3)(vii): Requiring that the employer ensure the installation of protective grounds;

b.    29 CFR 1910.269(n)(2): For any employee to work transmission and distribution lines or equipment as deenergized, the employer shall ensure that the lines or equipment are deenergized and shall ensure proper grounding of the lines or equipment. Similarly, 29 CFR 1926.962(b): requires for any employee to work

13

transmission and distribution lines or equipment as deenergized, the employer shall ensure that the lines or equipment are deenergized and shall ensure proper grounding of the lines or equipment.

c.    29 CFR 1910.269(n)(3): Requiring that temporary protective grounds shall be placed at such locations and arranged in such a manner that the employer can demonstrate will prevent each employee from being exposed to hazardous differences in electric potential.

d.    29 CFR 1910.269(n)(4)(i): Requiring that protective grounding equipment shall be capable of conducting the maximum fault current that could flow at the point of grounding for the time necessary to clear the fault. Similarly, 29 CFR 1926.962(d)(1)(i): Requiring that protective grounding equipment shall be capable of conducting the maximum fault current that could flow at the point of grounding for the time necessary to clear the fault.

e.    29 CFR 1910.269(n)(4)(iii): Requiring that protective grounds shall have an impedance low enough so that they do not delay the operation of protective devices in case of accidental energizing of the lines or equipment. Similarly, 29 CFR 1926.962(d)(2): Requiring that protective grounds shall have an impedance low enough so that they do not delay the operation of protective devices in case of accidental energizing of the lines or equipment.

f.    29 CFR 1926.962(e): Stating that the employer shall ensure that, unless a previously installed ground is present, employees test lines and equipment and verify

14

the absence of nominal voltage before employees install any ground on those lines or that equipment.

g.     NEC 250.53: Requiring the grounding rod/electrode shall be installed such that at least 2.44 m (8 ft) of length is in contact with the soil, that it shall be driven to a depth of not less than 2.44 m (8 ft) except that, where rock bottom is encountered, then the electrode shall be driven at an oblique angle not to exceed 45 degrees from the vertical or, where rock bottom is encountered at an angle up to 45 degrees, the electrode shall be permitted to be buried horizontally in a trench that is at least 750 mm (30 in.) deep, and the upper end of the electrode shall be flush with or below ground level.

h.     29 CFR 1904.39(a)(2) Requiring all employers to truthfully and accurately notify OSHA when an employee is killed on the job or suffers a work-related hospitalization, amputation, or loss of an eye within 24 hours.

i.     29 CFR 1910.335(a)(l)(i):  Mandating that employees working in areas where there are potential electrical hazards be required to use electrical protective equipment that is appropriate for the specific parts of the body to be protected and for the work to be performed.

j.     NESC 410 A. 1 & 2: Requiring that the employer shall inform each employee working on or in the vicinity of electric supply equipment and the associated lines, of the safety rules governing the employee's conduct while so engaged and requiring that the employer shall provide training to all employees who work on or in the vicinity of exposed energized lines and parts, and ensure that each employee has demonstrated proficiency in required tasks, and requiring that the employer shall

provide retraining for any employee who, as a result of routine observance of work practices, is not following work rules, which constitutes a consensus written industry standard;

k.    NESC 410 C. 1.: Requiring that a designated person shall be in charge of the operation of the equipment and lines and shall be responsible for their safe operation, which constitutes a consensus written industry standard;

l.    NESC 421 A.: Requiring the first-level supervisor or person in charge shall adopt such precautions as are within the individual's authority to prevent accidents, see that the safety rules and operating procedures are observed by the employees under the direction of this individual, and make all the necessary records and reports, as required, which constitutes a consensus written industry standard;

m.    NESC 422 C. 5.: Requiring that steps shall be taken to assure that the equipment or lines on which the employees are working are free from dangerous leakage or induction or have been effectively grounded when working on or in the vicinity of equipment or lines exposed to voltages higher than those guarded against by the safety appliances provided, which constitutes a consensus written industry standard;

n.    NESC 444 D.: Requiring that temporary protective grounds shall be placed at such locations and arranged in such a manner that affected employees are protected from hazardous differences in electrical potential, which constitutes a consensus written industry standard;

16

o.    NESC 444 E. 1.: Requiring that only after the equipment or lines have been de-energized and grounded, the employee in charge, and those under the direction of the employee in charge, may proceed with work on the de-energized parts and that equipment may be re-energized for testing purposes only under the supervision of the employee in charge and subject to authorization by the designated person, which constitutes a consensus written industry standard;

p.    NESC 445 A.: Requiring proper installation of grounds, testing for voltage, and determination of the source of voltage present, which constitutes a consensus written industry standard;

q.    Commonly accepted, consensus written industry standards related to proper grounding of power lines, and other written industry standards.

r.    Other written statutes, rules and regulations and industry standards that may reveal themselves during the discovery in this matter.

60.    On March 10, 2021, Zachary Bolling was required by defendants, and each of them, to work around and was working with a specific unsafe and dangerous working condition, in an unreasonably dangerous environment.

61.    Zachary Bolling was instructed and/or permitted by defendants to work in an unsafe and dangerous location, improperly too close to the source of dangerous electrical hazards and with a transmission line that was not properly grounded.

62.    On March 10, 2021, since the line was not properly grounded, defendants did not ensure that Zachary Bolling was wearing gloves rated for the electrical work he

was instructed to perform and/or Zachary Bolling was not required by defendants to wear gloves rated for the electrical work he was instructed to perform.

63.    Defendants failed to properly inspect, supervise, and control the work being performed on the job site.

64.    Plaintiff is informed and believes that defendants failed to provide proper task training and other training, particularly as it pertains to grounding and testing, and to provide a safe environment to perform work they requested of him.

65.    As a proximate result of the acts and omissions of defendants, and each of them, Zachary Bolling suffered a serious electrical shock on March 10, 2021, leading to permanent physical and psychological injury of at least thirteen percent whole body impairment, and permanent loss or significant impairment of function of a bodily organ or system.

66.    At times complained of herein, defendants Service Electric and Quanta Services and/or John Doe Company 1, 2, and 3 were acting as joint venturers, or participating in a joint adventure or joint enterprise, one of the other, in the repair of the transmission tower and work at the job site where the plaintiff was injured.

## COUNT I
### (Negligence)

Plaintiff incorporates all allegations above the same as if fully re-stated and re-alleged and plaintiff further alleges as follows:

67.    If it is determined that one or more of the defendants were not the employer of Zachary Bolling, then defendants' conduct constituted negligence.

68.    Defendants knew the work to be performed by Zachary Bolling was hazardous and dangerous.

69.    Defendants had the right to control and retained control of the work being performed on the job site and retained the right to halt work that was performed in an unsafe manner.

70.    Defendants had a duty to provide the plaintiff with a reasonably safe place to work and a duty to exercise reasonable care for his safety.

71.    Defendants had a duty to ensure that plaintiff had and was using the necessary safety equipment, including proper electrical gloves because the line was not properly grounded, to perform the work on March 10, 2021.

72.    Defendants had a duty to inspect the work being performed on the job site, to halt unsafe practices, to provide a proper ground for transmission power lines being worked on, and to instruct workers to not to perform work on the transmission line prior to determining whether the line was properly grounded.

73.    Defendants allowed work on a transmission line, knowing that the ground rod to which it was connected was only ten inches in the ground and knowing the soil was rocky, and thereby knowing the ground was insufficient, and thereby subjecting Zachary Bolling to a risk of serious injury or death.

74.    Defendants were  required, but failed to reasonably and properly inspect the ground rod prior to using it, and to test the line prior to working on it and and/or correct the unsafe conditions or hazards involving the transmission line, including the use of sufficient ground, use of electrical gloves, the testing of the line after it was

connected to the shallow ground rod in rocky soil, and/or failed to inspect the work to ensure it was performed in a safe manner, and were on notice, either actually or constructively and should have intervened on behalf of the plaintiff.

75.    The acts, conduct and omissions of defendants, acting in the manner and method as alleged above, were negligent, careless, wrongful and unlawful and violated their statutory, regulatory, and other duties and responsibilities to Zachary Bolling.

76.    As a proximate result of the negligent, wrongful, careless and unlawful acts, conduct and omissions of defendants, Zachary Bolling was seriously injured on March 10, 2021, and was injured and damaged as follows:

>    (a)    Zachary Bolling received both temporary and permanent injuries to his body;
>
>    (b)    Zachary Bolling suffered physical pain and suffering and mental anguish and emotional distress;
>
>    (c)    Zachary Bolling received medical and care and treatment and expenses and will require additional medical care and treatment in the future;
>
>    (d)    Zachary Bolling suffered from lost income and in the future will lose income;
>
>    (e)    The ability to perform services, protection, care and assistance provided to his family by the plaintiff; and
>
>    (f)    All damages recoverable under the law.

77.    The acts, conduct and omissions of defendants were reckless, willful and

wanton, and a conscious, reckless and outrageous indifference to the health, safety and welfare of others, such that plaintiff is entitled to punitive damages against them.

WHEREFORE, your plaintiff demands judgment against defendants for compensatory and punitive damages in an amount to be determined by a jury; the costs and disbursements of this action; a trial by jury; and for such other, further and general relief as the Court deems just and proper.

## COUNT II
### (Deliberate Intent-W.Va. Code §23-4-2)

Plaintiff incorporates all allegations above the same as if fully re-stated and re-alleged and plaintiff further alleges as follows:

78.    Defendants were responsible for complying with all safety laws, rules, regulations and industry standards applicable to the work their employees were performing.

79.    That defendants through their agents, servants, or employees wrongfully, with deliberate intent and/or otherwise unlawfully:

a.    Required the plaintiff to work around a transmission line carrying voltage without a proper distance between the plaintiff and said line; required the plaintiff to work on a transmission line that was not properly grounded; placed and used a grounding rod that was not of a proper depth and improperly placed in rocky terrain; was required to but failed to inspect and identify said line carrying voltage and said improper ground; instructed their agents and employees to work on the transmission line in an unsafe manner, without proper equipment, and safety controls and/or permitted the work on the unsafe transmission line in an unsafe manner without reasonable and proper correction despite knowledge of the specific unsafe conditions prior to the plaintiff's injury.

b.   Knew about such unsafe conditions or hazards involving the grounding rod and transmission line, particularly in light of the rules and regulations and standards regarding said work, grounding and testing.

c.   Were required, but failed to reasonably and properly inspect during the work being performed on the transmission power line and/or correct the unsafe conditions or hazards involving the transmission line, including the use of sufficient electrical gloves, the positioning of the grounding rod, and testing of the transmission line once it was disconnected from the tower and grounded to the shallow rod in the rocky ground and/or failed to inspect the work to ensure it was performed in a safe manner, and were on notice, either actually or constructively and should have intervened on behalf of the plaintiff's decedent and other workers.

d.   Were required, but failed to warn their employees, including the plaintiff concerning the potential hazards presented by such unsafe conditions involving the transmission power line and improper ground, when they knew about such matters.

e.   Were required, but did not ensure that safe work policies and procedures were being practiced to assure persons were located at a safe distance away from improperly grounded electrical power lines carrying voltage, in the manner required and did not assure that workers correctly performed these procedures.

f.   Were required but did not ensure that proper safety equipment was being used, including electrical gloves sufficient for the conditions to which plaintiff was being subjected.

g.   Were required, but failed, to follow known rules, regulations and industry standards for electrical work of the kind being performed at the job site.

h.   Were required, but failed, to properly task train their workers in placing grounds for transmission power lines.

i.   Were required to but did not test the transmission line for voltage, once it was disconnected from the tower ground.

j.   Violated and failed to adequately inspect and ensure compliance with specific, well-known industry standards and safety rules, regulations and law, including those listed above and hereafter, and ensure the safety of the workers prior to and on March 10, 2021.

80.     As set forth above, there were specific unsafe working conditions which existed at the job site and which presented a high degree of risk and a strong probability of serious injury or death to employees who worked there.

81.     Defendants had actual knowledge of the existence of the specific unsafe working conditions and of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working conditions. The plaintiff's foreman and the general foreman had a direct line of site to the grounding rod to which the transmission line was attached, and knew that the grounding rod was placed shallowly in rocky soil, thereby creating an improper and unsafe ground, knew the transmission line was not tested once it was disconnected from the tower ground, and knew the plaintiff was performing work on the transmission line. The defendants knew of the need for gloves rated for the electrical hazard involved given the line was not properly grounded.

82.     The specific unsafe working conditions above were violations of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of the employer, as demonstrated by competent evidence of written standards or guidelines which reflect a consensus safety standard in the industry or business, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions, including, but not limited to, those standards listed above herein.

83.     Notwithstanding the existence of the facts set forth above, defendants intentionally thereafter exposed Zachary Bolling to the specific unsafe working condition.

84.     That defendants had the opportunity to and could have remedied and made safe the specific unsafe working conditions prior to plaintiff's injury.

85.     That Zachary Bolling was seriously and permanently injured as a direct and proximate result of the specific unsafe working conditions.

86.     Zachary Bolling was an employee subject to the workers' compensation laws of West Virginia.

87.     As Zachary Bolling was an employee injured while working on temporary project on the border of West Virginia and Virginia and, if in an adjoining state, plaintiff has the right to recover under West Virginia's Workers' Compensation Act in an action under the deliberate intention statute.  As Zachary Bolling was an employee covered by the West Virginia Workers' Compensation Act, plaintiff is entitled to all benefits and privileges under the West Virginia Workers' Compensation Act, including the right to file a direct deliberate intention cause of action against defendants pursuant to W.Va. Code 23–4–2(c)(2).

88.     As a proximate result of the intentional acts, conduct and omissions of defendants, as set forth above, the plaintiff was damaged as aforesaid.

89.     That, alternatively, should it be determined through discovery that the defendants were not in full compliance with the Workers' Compensation Act, or that one or more of the defendants was not an employer of Zachary Bolling pursuant to

W.Va. Code §23-2-6, during the relevant time period, then the actions as described in the paragraphs above, incorporated as if stated verbatim herein, constitute negligence, recklessness, and a breach of the duty of reasonable and due care owed to the plaintiff on the part of defendants.

90.    As a proximate result of the wrongful, careless and unlawful acts, conduct and omissions of defendants, Zachary Bolling was seriously injured on or about March 10, 2021 and was injured and damaged as follows:

(a)    Zachary Bolling received both temporary and permanent injuries to his body;

(b)    Zachary Bolling suffered physical pain and suffering and mental anguish and emotional distress;

(c)    Zachary Bolling received medical and care and treatment and expenses and will require additional medical care and treatment in the future;

(d)    Zachary Bolling suffered from lost income and in the future will lose income;

(e)    Loss of ability to provide services, protection, care and assistance provided to his family by the plaintiff; and

(f)    All damages recoverable under the law.

WHEREFORE, your plaintiff demands judgment against defendants for compensatory and, if applicable, punitive damages in an amount to be determined by a jury; the costs and disbursements of this action; a trial by jury; and for such other,

further and general relief as the Court deems just and proper.

PLAINTIFF DEMANDS A TRIAL BY JURY.

ZACHARY BOLLING,
Plaintiff,

By Counsel

s/Kelly Elswick-Hall
Kelly Elswick-Hall
West Virginia State Bar No. 6578
Marvin W. Masters
West Virginia State Bar No. 2359
The Masters Law Firm lc
181 Summers Street
Charleston, West Virginia  25301
Telephone:  (304) 342-3106
Facsimile:  (304) 342-3189
*keh@themasterslawfirm.com*

Counsel for Plaintiff
F:\2\786\p001.docx